NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| GEORGE R.,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | Civil Action No. 24-9790 (RK)<br><br>**OPINION** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court on George R.'s[1] ("George" or "Plaintiff") appeal from the Commissioner of the Social Security Administration's (the "Commissioner") final decision, which denied George's request for a period of disability insurance benefits. (ECF No. 1.) The Court has jurisdiction to review this appeal under 42 U.S.C. § 405(g) and reaches its decision without oral argument under Local Civil Rule 78.1. For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I. BACKGROUND

In this appeal, the Court must answer the following question: Does substantial evidence support Administrative Law Judge Ellen P. Bush's ("Judge Bush") determination that George was not disabled?

### A. PROCEDURAL POSTURE

In 2022, George filed an application for a period of disability insurance benefits, alleging

---

[1] The Court identifies Plaintiff by first name and last initial only. *See* D.N.J. Standing Order 2021-10.

an onset date of October 5, 2021. (Administrative Record ("AR") at 244–245.)[2] At the time of the subject application, George was 47 years old. (*Id.*) The Social Security Administration (the "Administration") denied these requests both initially (*id.* at 73), and on reconsideration (*id.* at 83). Thereafter, George requested a hearing before an Administrative Law Judge ("ALJ"). (*See id.* at 126–127.) On March 25, 2024, Judge Bush held a hearing at which she received testimony from both George, represented by counsel, and Christine Spaulding, a vocational expert ("VE"). (*Id.* at 39–72.) On May 2, 2024, Judge Bush issued a written decision, finding that George was not disabled. (*Id.* at 14–31.)

The Administration's Appeals Council denied George's request to review Judge Bush's decision. (*Id.* at 1–6.) This appeal followed. (ECF No. 1.) The Record was filed on the docket on December 16, 2024. (ECF No. 4.) George then filed his moving brief ("Pl. Br.," ECF No. 5), the Commissioner filed an opposition ("Opp. Br.," ECF No. 11), and George filed a reply ("Reply Br.," ECF No. 12).

### B.    JUDGE BUSH'S DECISION

In her May 2, 2024 decision, Judge Bush held that George was not disabled under the prevailing Administration regulations. (*See generally* AR at 14–31.) To reach this decision, Judge Bush analyzed George's application under the five-step process for determining whether an individual is disabled as set forth in 20 C.F.R. § 404.1520(a). At Step One, Judge Bush found that George had not engaged in substantial gainful activity since the alleged onset date of October 5, 2021. (*Id.* at 19 (citing 20 C.F.R. §§ 404.1571 *et seq.*).) At Step Two, Judge Bush found that George suffered from several severe impairments: chronic pain syndrome, "lumbar radiculopathy

---

[2] The Administrative Record ("Record" or "AR") is available at ECF Nos. 4-1 through 4-20. This Opinion will reference only page numbers in the Record without the corresponding ECF numbers.

and degenerate disc disease status-post lumbar spine discectomy/fusion,"[3] depression, and anxiety. (*Id.* (citing 20 C.F.R. § 404.1520(c)).)

At Step Three, Judge Bush determined that George did not have an "impairment or combination of impairments" that qualified under the Administration's listed impairments. (*Id.* at 20 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).) She observed that the record showed George "was able to perform fine and gross movements effectively," and that there was no evidence that George "ha[d] been prescribed an assistive device requiring the use of both upper extremities." (*Id.* at 21.) Judge Bush determined that George had a mild limitation in understanding, remembering or applying information, but moderate limitations in (i) interacting with others; (ii) concentrating, persisting or maintaining pace; and (iii) adapting or managing oneself. (*Id.* at 21–22.)

As a precursor to Step Four, Judge Bush concluded that George had the residual functional capacity ("RFC") to perform light work, *see* 20 C.F.R. §§ 404.1567(b), but that any job he performed had to be limited in specified ways:

> [L]ight work . . . except [George can only] lift 20 pounds occasionally and 10 pounds frequently. [George] can stand and/or walk for a total of four hours per day and sit for six hours. He can occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. [George] needs [sic] avoid concentrated exposure to unprotected heights. He can carry out simple instructions and attend and focus to complete simple tasks. [George] can interact occasionally with [the] general public and co-workers. He can adapt to minor and infrequent changes to tasks.

(AR at 22.) At Step Four, Judge Bush concluded that George was not capable of performing his

---

[3] In layman's terms, George was diagnosed with spine and back disorders following spine/back surgery. Lumbar radiculopathy "can cause pain, numbness and tingling along a pinched nerve in [the] back" and radiate to one's legs. *Radiculopathy*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/22564-radiculopathy (last visited July 8, 2025). Degenerative disk disease "occurs when the cushioning in [the] spine begins to wear away." *Degenerative Disk Disease*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/16912-degenerative-disk-disease (last visited July 8, 2025). The Court does not rely on these definitions for purposes of issuing this Opinion but merely provides them as helpful context.

past relevant work as a cheerleading coach and health club manager. (*Id.* at 29 (citing 20 C.F.R. §§ 404.1565).)

Finally, at Step Five, Judge Bush heard testimony from the VE and concluded that "there [were] jobs that exist[ed] in significant numbers in the national economy" that George could perform. (*Id.* (citing 20 C.F.R. §§ 404.1569, 404.1569a).) The impartial VE testified that the representative jobs George could perform, consistent with Judge Bush's RFC, included collator operator, price marker, and mail sorter. (*Id.* at 30.) Judge Bush ultimately concluded that "considering [George's] age, education, work experience, and residual functional capacity, [George] [was] capable of making a successful adjustment to other work that exist[ed] in significant numbers in the national economy." (*Id.*) Thus, Judge Bush concluded that George was not under a disability from October 5, 2021 through the date of decision. (*Id.* (citing 20 C.F.R. §§ 404.1520(g).)

This appeal primarily concerns Judge Bush's RFC determination as a precursor to Step Four and her determination of occupations representative of George's RFC at Step Five. (*See generally* Pl. Br.) Thus, the Court summarizes in greater detail these aspects of Judge Bush's decision.

          1.  <u>George's RFC</u>

In determining George's RFC, Judge Bush carefully considered "the entire record." (AR at 22.) This included a review of (i) George's own reported symptoms; (ii) the objective medical evidence; (iii) medical opinions and prior administrative medical findings; and (iv) a third-party statement by George's wife.

          a.  *George's Reported Symptoms*

Judge Bush began by considering George's reported symptoms. (*Id.* at 23.) As she summarized, George reported that he felt constant pain in his lower back into his legs, feet, and

4

both hands. (*Id.* (citing AR at 321–326).) He explained that his pain affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, use his hands, get along with others, complete tasks, and concentrate. (*Id.* (citing AR at 327–338).) Nonetheless, Judge Bush noted that George could lift up to 20 pounds and walk fifteen minutes before requiring a break. (*Id.* (citing AR at 327–338).) Further, George reported being able to take care of his children (including cooking for them, clothing them, bathing them, helping them with homework, and taking them to activities), take care of his pets (including feeding and walking them), perform household chores, walk, drive, and shop in stores. (*Id.* (citing AR at 327–338).) Judge Bush observed that George reported "sometimes" being able to prepare his own meals, and that he could go out alone, spend time with others, follow written instructions, adapt to change, and get along with authority figures. (*Id.* (citing AR at 327–338).)

While Judge Bush found that George's medically determinable impairments could reasonably be expected to cause his alleged symptoms, she found that his statements concerning the intensity, persistence and limiting effects of these symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (*Id.*) Judge Bush reasoned that George's ability to drive illustrated that he could use hand and foot controls, turn his head, and sit for continuous periods of time, as well as bend and stoop to get in and out of a car. (*Id.* at 24.) What's more, he spoke of taking care of his children and pets, as well as shopping in stores and traveling by walking, which would be inconsistent with his statements regarding limited mobility. (*Id.*) Further, Judge Bush flagged that George *did* return to work following the alleged onset date, but he ceased working after his employment position was no longer available. (*Id.* (citing AR at 2183).)

b.    *Objective Medical Evidence*

Judge Bush next turned to considering the available medical evidence. She noted that on

October 5, 2021 (the alleged onset date), George underwent spine/back surgery, namely "L3-S1 posterior lumbar decompression and fusion (PLDF) and L3-5 posterior lumbar interbody fusion (PLIF)," due to severe spinal stenosis, flat back syndrome, and radiculopathy. (*Id.* at 24 (citing AR at 494, 510).) After surgery, George attended routine follow-up treatments and a course of physical therapy. (*Id.* (citing AR at 1481).) He reported no specific complaints and stated that his numbness and tingling had improved. (*Id.* (citing AR at 965, 1002).) Indeed, Judge Bush summarized medical notes which reported George "had excellent progress in physical therapy," "improved function in [his] activities of daily living," and "had improved range of motion, strength, balance, and squatting ability." (*Id.* (citing AR at 1434, 1444).) Further, Judge Bush cited X-rays in January and September 2022 that revealed "stable fusion with instrumentation intact," "normal height and alignment of the vertebral bodies," and "intact upper lumbar spine without fracture or destructive bone lesion." (*Id.* at 24 (citing AR at 965, 1510–1517).)

However, Judge Bush also noted that George later reported lower back and neck pain, stiffness, numbness in both hands and feet, and "shooting pain with weakness in the bilateral upper extremities." (*Id.* (citing AR at 965, 1448, 1481, 1613, 1621, 1631, 2090).) Judge Bush summarized additional medical records that indicated that George's "forward flexion and lateral rotation was guarded," he had "muscle spasms, tenderness, and decreased range of motion in his lumbar spine," and he had "sensory deficits over the L5 dermatome involving the left lower extremity and decreased strength in the lower extremities." (*Id.* at 25 (citing AR at 965, 1483–84, 1510–1517, 1614, 1622, 1632, 1682, 2162–2168).) Judge Bush also acknowledged George's reported difficulty walking on his heels and toes, as well as his "decreased sensation in his upper extremities and reduced range of motion of his cervical spine."[4] (*Id.* (citing AR at 1510–1517,

---

[4] Judge Bush observed that an October 2023 lumbar magnetic resonance imaging ("MRI") revealed "disc herniation, degenerative changes and epidural lipomatosis at L2-L3 contributed to moderate to severe

1622, 1682).) She summarized the host of medical diagnoses George received throughout the record: "lumbar radiculopathy, lumbar other intervertebral disc displacement, post-laminectomy kyphosis, peripheral neuropathic pain, and chronic pain syndrome." (*Id.* (citing AR at 965, 1678, 2091).)

Judge Bush determined that the record contained "some objective findings" related to George's physical impairments, "but not to the level of severity alleged." (*Id.*) As she concluded:

> [George] had normal range of motion of his musculoskeletal system, 5/5 motor strength, his ambulatory status was upright, he stood in a forward flexed position without pain, negative straight leg raise bilaterally, and normal gait. Furthermore, [George] stated that he took care of his three children (cook/feed, clothe, bathe, helped with homework, and took them to activities), took care of his pets (feed [sic], walked, and interacted with), sometimes prepared his own meals, performed household chores, walked for travel, drove, and shopped in stores. [George] stated that he was able to mow his yard with a riding lawn mower. It was noted that [George] returned to work but ceased because the position no longer existed in August 2022. He stated that he could lift 20 pounds maximum.

(*Id.* (internal citations omitted)).)

Turning to his mental impairments, Judge Bush noted George had been diagnosed with anxiety and depression. (*Id.* at 26 (citing AR at 1001, 1503–1505).) He reported experiencing uncontrollable worry, restlessness, irritability, and dread. (*Id.* (citing AR at 1652).) He further reported problems with mood, sleep, energy, self-esteem, and concentration, as well as suicidal ideation and thoughts of self-harm. (*Id.*) Nonetheless, he reported feeling better with medication. (*Id.* (citing AR at 1658).)

Judge Bush concluded that George's mental "symptoms were infrequent" and that he

---

central canal narrowing; central canal narrowing was mildly progressed; additional postsurgical and multilevel degenerative changes of the spine, for example with severe bilateral foraminal narrowing L5-S1; and improvement of central canal narrowing and narrowing of both subarticular recesses at L3-L4 through L5-S1." (AR at 24–25 (citing AR at 2169–2174).) Further, a nerve conduction study ("NCS") and electromyography ("EMG") that same month revealed "severe acute left L5 /S1 radiculopathy, posterior primary rami; mild left motor peroneal axonopathy, no denervation; and moderate left motor tibial axonopathy, no denervation." (*Id.* at 25 (citing AR at 2162–2168).)

responded well to conservative treatment with medication and therapy. (*Id.* (citing AR at 1001, 1503–1505, 1642, 1655, 1658, 1665, 2233–2239).) Further, he "had fairly extensive mental activities of daily living" including shopping, caring for his children and pets, and following written instructions. (*Id.* (citing AR at 327–338).) Judge Bush noted that despite George being described as curt, depressed, tearful, and somewhat irritable in the record, (*id.* (citing AR at 1503–1505, 1665)), he was also described as "pleasant and cooperative" with "fluent and goal-directed speech, and adequate eye contact." (*Id.* (citing AR at 1002, 1005, 1503–1505, 1510–1517, 1614, 1622, 1644, 1653).) Medical records indicated George had an intact memory, concentration, attention span, judgment, insight, and impulse. (*Id.* (citing AR at 1503–1505, 1644, 1653, 1659, 1665).) He was further described as being alert and oriented, having a goal-directed and organized thought process, and appearing "well developed and well nourished." (*Id.* (citing AR at 1005, 1503–1505, 1510–1517, 1622, 1644, 1653).) Thus, much like with George's physical impairments, Judge Bush found that the record did not support the claimed level of alleged severity as to George's mental impairments. (*Id.*)

### c. *Medical Opinions and Prior Administrative Medical Findings*

Judge Bush next considered five medical opinions and prior administrative medical findings on the record. *First*, Judge Bush found the prior administrative medical findings of James Orsini, MD and Jacques Gulekjian, MD to be persuasive. (*Id.* at 27.) As she summarized, these doctors determined that George could "perform light work except stand and/or walk for a total of four hours, occasionally perform postural maneuvers except never climb ladders, ropes, and scaffolds, and avoid concentrated exposure to hazards." (*Id.* (citing AR at 74–82, 84–93).) Judge Bush noted these doctors' opinions were both supported with citations to record medical evidence and consistent with the overall record. (*Id.*)

*Second*, Judge Bush found the medical opinion of Thomas Xenakis, PT, DPT ("DPT

8

Xenakis") to be "somewhat persuasive." (*Id.*)  He opined that George could, among other things, undertake "very heavy work" and stand/walk for greater than 45–60 minutes. (*Id.* (citing AR at 2138, 2140.) However, Judge Bush determined that the record as a whole suggested a "less stressful exertion" and "much more restrictive residual functional capacity" than that opined by DPT Xenakis. (*Id.*)

*Third*, Judge Bush rejected the opinion of Rafael Levin, MD ("Dr. Levin") as unpersuasive. (*Id.* at 27–28.) While Dr. Levin opined that George could lift no more than 15 pounds, could not undertake repetitive bending, and required 20 minutes of sitting every hour, Judge Bush observed this opinion was given prior to George's spine/back surgery and was consistent with neither the medical record nor George's own statements. (*Id.*) For example, George stated he could lift up to 20 pounds and the medical evidence indicated he had a normal range of motion of his musculoskeletal system. (*Id.* at 28 (citing AR at 327–338, 965, 1004–1005, 1483, 1503–1505, 1510–1517, 1653, 2162–2168, 2183, 2213, 2215, 2220).)

*Fourth*, Judge Bush found the prior administrative medical findings of Blythe Farish-Ferrer, Ph.D. ("Dr. Farish-Ferrer") and Jocelyn Fierstien, Psy.D. ("Dr. Fierstien") to be "generally persuasive." (*Id.* at 28.) Judge Bush explained that these doctors believed George might have difficulty with complex tasks, but that he nonetheless could accept supervision (although he might not be suited for work with the general public), and could perform simple tasks for two plus hours at a time without special supervision. (*Id.* (citing AR at 74–82, 84–93).) Judge Bush noted that they also opined George could attend work regularly, need not miss more than an occasional day due to mental illness, could use public transportation, and could make work-related decisions, including protecting himself from work-related hazards. (*Id.*) Judge Bush ultimately found these opinions were supported with facts and aligned with the medical record. (*Id.*)

*Fifth*, Judge Bush did not find the medical opinions of Tracy Mount, PMHNP-BC ("Ms. Mount") and Samantha Notaro, MSW, LCSW ("Ms. Notaro") to be persuasive. (*Id.* (citing AR at 2112–2116, 2233–2239).) These opinions suggested George was "seriously limited, unable to meet competitive standards, or had no useful ability to function in a number of areas of unskilled work and semi-skilled work and would miss more than four days per month." (*Id.*) Judge Bush found that these opinions—which amounted to filling out checkbox forms—were neither supported with citation to objective evidence nor consistent with the medical record. (*Id.*) Judge Bush also dismissed as "neither valuable nor persuasive" a statement by Ms. Notaro indicating that she believed George met the criteria for disability benefits. (*Id.*)

### d.  *Third-Party Statement*

Finally, Judge Bush reviewed a statement submitted by George's wife which "provided context regarding some of the challenges faced by [George] relative to coping with the chronic nature of his impairments and maintaining his daily activity level secondary to them." (*Id.* (citing AR at 403–410).) While his wife corroborated George's allegations of not being able to work, Judge Bush found that "[h]er statement [was] inconsistent with [George's] own accounts of high activities of daily living, as well as the objective findings in the medical record." (*Id.* at 29.)

In sum, Judge Bush determined that George's carefully-crafted RFC was "supported by the medical record, the objective findings related to his alleged impairments, and the record as a whole." (*Id.*)

### 2.  Representative Occupations

At Step Five, Judge Bush relied on the VE's testimony at the March 25, 2024 hearing. There, Judge Bush provided George's age, education, work experience, and residual functional capacity to the VE. (*Id.* at 30; *see id.* at 65–68.) The VE then testified that George could perform three representative occupations that only required "light" work. (*Id.*) Specifically, the VE testified

that George could perform work as a (i) collator operator, for which 31,000 jobs existed in the national economy; (ii) price marker, for which 82,000 jobs existed in the national economy; and (iii) mail sorter, for which 61,000 jobs existed in the national economy. (*Id.*) Judge Bush found that the VE's testimony was "consistent with" the Dictionary of Occupational Titles ("DOT") and concluded that George was "capable of making a successful adjustment to other work that exist[ed] in significant numbers in the national economy." (*Id.*) Thus, Judge Bush concluded George was "not disabled." (*Id.*)

## II.    LEGAL STANDARD

### A.    STANDARD OF REVIEW

The Court reviews the "final decision of the Commissioner of Social Security" to determine whether the Commissioner's findings are "supported by substantial evidence." 42 U.S.C. § 405(g). In the event that the Appeals Council denies a claimant's request for review, "the ALJ's decision is the Commissioner's final decision." *Matthews v. Apfel,* 239 F.3d 589, 592 (3d Cir. 2001). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (quoting *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Put differently, "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Morales v. Apfel,* 225 F.3d 310, 316 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)). This evidentiary threshold "is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).

The scope of the Court's review of the ALJ's decision is "quite limited." *Rutherford*, 399 F.3d at 552. On review, the Court may not "re-weigh the evidence or impose [its] own factual determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). "Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even

if we would have decided the factual inquiry differently." *Fargnoli v. Massanari,* 247 F.3d 34, 38 (3d Cir. 2001). The court must "review the record as a whole to determine whether substantial evidence supports a factual finding." *Zirnsak,* 777 F.3d at 610 (citing *Schaudeck v. Comm'r of Soc. Sec. Admin.,* 181 F.3d 429, 431 (3d Cir. 1999)). "Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter v. Harris,* 642 F.2d 700, 706–07 (3d Cir. 1981) (citation omitted).

### B.    ESTABLISHING ELIGIBILITY FOR DISABILITY INSURANCE BENEFITS

A claimant may establish disability under the Social Security Act by proving they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ applies a well-established "five-step sequential evaluation process," which requires considering whether the claimant:

> (1) is engaged in substantial gainful activity; (2) suffers from an impairment or combination of impairments that is "severe"; (3) suffers from an impairment or combination of impairments that meets or equals a listed impairment; (4) is able to perform his or her past relevant work; and (5) is able to perform work existing in significant numbers in the national economy.

*McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) (citing 20 C.F.R. §§ 404.1520(a)–(f), 416.920(a)–(f)). The claimant bears the burden at the first four steps, at which point it shifts to the Commissioner at Step Five. *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019).

## III.    <u>DISCUSSION</u>

Plaintiff raises six issues on appeal. Five of these issues pertain to elements of the record Plaintiff argues Judge Bush did not properly consider: (i) George's moderate limitation in interacting with others; (ii) George's hand impairment; (iii) George's "frequent" need for treatment; (iv) George's statements as related to the intensity, persistence, and limiting effects of his symptoms; and (v) the medical opinions of Dr. Levin, Ms. Mount, and Ms. Notaro. Plaintiff's sixth and final issue is that the Commissioner did not meet their burden at Step Five to demonstrate that Plaintiff could perform work that existed in significant numbers in the national economy. (*See* Pl. Br.) The Court addresses each argument in turn.

### 1.   <u>George's Moderate Limitation in Interacting with Others</u>

At Step Three of her analysis, Judge Bush determined George had a "moderate" limitation in interacting with others. (*See* AR at 21.) In then crafting George's RFC, Judge Bush included a limitation that George could "interact occasionally with [the] general public and co-workers." (*Id.* at 22.) Plaintiff now takes issue with this RFC limitation because it is silent with respect to George's ability to interact with a supervisor. According to Plaintiff, "[i]t is inconsistent on its face for the Commissioner to find a severe psychiatric disability, a 'moderate' limitation in interactions with others, and then make no indication in the RFC as to why Plaintiff is not limited, *in any way*, in contacts with supervisors." (Pl. Br. at 17 (emphasis in original).)

Contrary to Plaintiff's assertion, the absence of a limitation in the RFC with respect to George's contact with supervisors is supported by substantial evidence. Judge Bush explicitly found persuasive the prior administrative medical findings of Dr. Farish-Ferrer and Dr. Fierstien who opined that George could accept supervision and would not need special supervision for performing simple tasks. (AR at 28; *see* AR at 74–82, 84–93.) Judge Bush went on to explain that "[t]he opinion was supported with facts pertaining to [George's] impairments and symptoms cited

13

within the assessments, which revealed [] relatively normal mental status findings except for neutral mood and flat affect." (*Id.* at 28.) What's more, Judge Bush noted George himself stated he "got along fine with authority figures." (*Id.*)

Plaintiff notably does not argue that he requires a limitation with respect to interacting with a supervisor, nor does he cite to any record evidence that would support such a limitation. Rather, he merely argues that the purported failure of Judge Bush to explicitly reference George's ability to interact with a supervisor is a "facial and fundamental violation of the regulations." (Pl. Br. at 16.) However, unlike cases that have been remanded due to an ALJ's failure to explain the omission of a limitation for supervisor interaction, *see, e.g., Peggy C. v. Kijakazi*, No. 19-17472, 2021 WL 3206812, at *6 (D.N.J. July 29, 2021), the reason for the omission here is clear from Judge Bush's RFC analysis. *See Yury R. v. Dudek*, No. 22-5048, 2025 WL 684849, at *8 (D.N.J. Mar. 4, 2025) ("[T]he ALJ's discussion of the state agency reviewing consultants' opinions . . . permits meaningful judicial review sufficient to conclude that substantial evidence supports the ALJ's failure to limit Plaintiff's RFC in connection with social restrictions related to supervisors.") In light of Judge Bush's reliance on prior administrative medical findings indicating George could accept supervision, the absence of a limitation with respect to same is supported by substantial evidence.

## 2.  George's Hand Impairment

Plaintiff next argues that Judge Bush erred in failing to mention Plaintiff's hand impairment at both Step Two's severe-impairment determination and within the pre-Step Four RFC determination. (Pl. Br. at 17–18.) At Step Two, "an impairment is severe only if it significantly limits the claimant's physical or mental ability to do 'basic work activities[.]'" *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 144 (3d Cir. 2007) (quoting 20 C.F.R. § 404.1521(b)). Plaintiff does not cite to record evidence to support the severity of his hand impairment or "present evidence

that th[is] limitation[] significantly limited [his] ability to do basic work activities or impaired [his] capacity to cope with the mental demands of working." *Id.* Nonetheless, Judge Bush did find that George had the severe impairment of "chronic pain syndrome." (AR at 19.) Thus, the Court cannot find that Judge Bush's determinations at Step Two were unsupported by substantial evidence.

With respect to Judge Bush's RFC determination, her analysis repeatedly references George's purported hand impairments:

- "He stated that his main areas of pain included the lower back into his legs and feet along with both hands." (AR at 23 (citing AR at 321–326));

- "[George] stated that his impairments affected his ability to . . . use his hands[.]" (*Id.* (citing AR at 327–338).)

- "He later complained of numbness in both hands and both feet[.]" (*Id.* at 24 (citing AR at 1613, 2090).)

- "He had decreased sensation in his upper extremities . . . " (*Id.* at 25 (citing AR at 1622, 1682).)

However, she also noted that George's "ability to drive shows the ability to use hand and foot controls . . ." (*Id.* at 24.) Further, Judge Bush found George's symptoms, which included "decreased sensation in his upper extremities," actually supported a "*much more restrictive*" RFC than that propounded in the medical opinion of DPT Xenakis. (*Id.* at 27 (emphasis added).)

Judge Bush's thorough and well-reasoned RFC analysis spanned eight pages—indeed, the majority of her decision—and laid out all of her considerations in crafting George's RFC. Plaintiff's argument that Judge Bush's decision was missing "any discussion of how [the hand impairment] was considered in the RFC assessment" (Pl. Br. at 18), is without merit. *See Tompkins v. Astrue*, No. 12-1897, 2013 WL 1966059, at *13 (D.N.J. May 10, 2013) ("[T]here is no format to which an ALJ must adhere when giving her reasoning so long as 'there is sufficient development of the record and explanation of findings to permit meaningful review'" (quoting *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004))).

### 3.  George's "Frequent" Need for Treatment

Plaintiff next posits that Judge Bush "failed to take the frequent need for treatment into account in rendering" her decision. (Pl. Br. at 19.) An RFC determination must reflect a plaintiff's capacity to work "on a regular and continuing basis," which the Administration interprets as "8 hours a day, for 5 days a week, or an equivalent work schedule." 20 C.F.R. § 404.1545(b); SSR 96-8p. Plaintiff relies on three cases in the Third Circuit to argue Judge Bush erred in determining Plaintiff's capacity for work without consideration of his treatment needs. In the first, *Kangas v. Bowen*, the Third Circuit remanded a case upon determining the ALJ "failed to evaluate the effect of [a claimant's] frequent hospitalizations on his ability to perform any work on a regular, continuing or sustained basis." 823 F.2d 775 (3d Cir. 1987) (calling this a "critical factor"). In the second, *Eberhart v. Massanari*, the Middle District of Pennsylvania reversed a non-disability determination after finding that the ALJ failed to ask the VE about potential limitations related to a claimant's insomnia. 172 F. Supp. 2d 589, 598 (M.D. Pa. 2001) ("[I]n cases dealing with the inability to sleep, it is valuable to probe the vocational expert regarding that limitation."). Similarly, in *Dobrowolsky v. Califano*, the Third Circuit remanded a case where the VE was not probed on the claimant's "inability to sleep." 606 F.2d 403 (3d Cir. 1979).

The instant case is clearly distinguishable on the record. While *Kangas*, *Eberhart*, and *Dobrowolsky* deal with frequent hospitalizations and disruptive sleep disorders, Plaintiff cites to medical records that reveal nothing beyond standard treatment from the onset date to the date of Judge Bush's decision. For example, Plaintiff cites to records indicating George attended post-surgery follow-up appointments, physical therapy appointments, therapy sessions, and medical appointments related to pain management. (Pl. Br. at 5–10; *see, e.g.*, AR at 1132, 1503, 1642, 1680, 2103, 2178, 2240.) Judge Bush's RFC analysis comprehensively considers the medical records that emerged out of these appointments. (*See* AR at 24–27.)

16

In *Scott R. v. Kijakazi*, a court in this District rejected an identical argument to the one Plaintiff attempts to make here, namely that "his frequent need for treatment rendered him unable [to] work on a 'regular and continuing basis.'" 643 F. Supp. 3d 483, 493–94 (D.N.J. 2022). In distinguishing *Kangas*, the court explained:

> [I]n *Kangas*, the plaintiff's condition required eight hospitalizations—many of which entailed seven-to-ten days of in-patient treatment, followed by one-to-two-week at-home recovery periods—in the span of sixteen months. Here, Plaintiff's course of treatment was not nearly as frequent, lengthy, or disruptive. Granted, Plaintiff cites over sixty doctor's appointments that he attended in a twenty-month period. Although averaging more than three doctor's appointments per month is undoubtedly significant, the inconvenience of these appointments pales in comparison to the lengthy hospitalizations and recovery periods experienced by the plaintiff in *Kangas*. Moreover, unlike *Kangas*, Plaintiff's doctor's appointments were scheduled and he was able to maintain a work schedule despite them.

*Id.* at 494 (internal citations omitted). Like the plaintiff in *Scott R.*, nothing in the instant record rises to the level of *Kangas*. Indeed, Plaintiff does not point to any record evidence indicating that his medical appointments are so unmanageable so as to preclude him from sustaining work on a regular and continuing basis. *See Ralph F. v. Comm'r of Soc. Sec. Admin.*, No. 23-20882, 2024 WL 4349621, at *4 (D.N.J. Sept. 30, 2024) ("[A] plaintiff must 'affirmatively point . . . to specific evidence that demonstrates he should succeed.'" (quoting *Woodson v. Comm'r of Soc. Sec.*, 661 F. App'x 762, 766 (3d Cir. 2016))). Rather, as mentioned, Plaintiff merely cites to treatment appointments unsurprising for someone post-intensive surgery, including routine physical therapy appointments, pain management consults, and mental health therapy. (Pl. Br. at 5–10.) Plaintiff does not cite the Court to any record evidence that would indicate his course of treatment is so "frequent, lengthy, or disruptive" as to rise to the level of *Kangas* and be work-preclusive. *Scott R.*, 643 F. Supp. 3d at 494; *see Atkins v. Comm'r of Soc. Sec.*, 810 F. App'x 122, 129 (3d Cir. 2020) ("'[J]udges are not like pigs, hunting for truffles buried in the record.'" (quoting *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 (3d Cir. 2006), *as amended* (May 5,

17

2006)).

Plaintiff also notes that in response to a question from counsel, the VE stated that "[n]o more than one absence per month would be tolerated" for competitive work. (Pl. Br. at 19; AR at 69.) However, even accepting this as true, Plaintiff does not posit that he is precluded from scheduling treatment around a work schedule. There is nothing in the record to suggest that Judge Bush should have explicitly considered whether George's regular treatment precluded sustained work. Thus, Judge Bush "did not err in declining to find Plaintiff disabled based on his frequent medical appointments."[5] *Scott R.*, 643 F. Supp. 3d at 494.

4.  George's Statements as Related to the Intensity, Persistence, and Limiting Effects of His Symptoms

Next, Plaintiff contests Judge Bush's two-step analysis under SSR 16-3p in determining George's RFC, wherein she was first required to determine whether George had a medically determinable impairment that could reasonably expected to produce his alleged symptoms, and then "evaluate the intensity and persistence of [George's] symptoms . . . and determine the extent to which [George's] symptoms limit[ed] his . . . ability to perform work-related activities." SSR 16-3p. Judge Bush's analysis under SSR 16-3p led to the conclusion that George's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that George's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record[.]" (AR

_____

[5] Within the same section of his opening brief, Plaintiff also argues that Judge Bush "committed legal error by failing to consider whether Plaintiff was disabled for at least a 26 month period." (Pl. Br. at 18; *see* Reply Br. at 3.) However, Judge Bush expressly considered whether George was disabled "from October 5, 2021, through the date of [] decision," which was May 2, 2024. (AR at 30–31.) This is an approximately 30-month period. It is unclear from Plaintiff's briefing what period of time he believes Judge Bush failed to consider, or during what period "of not less than 12 months" he thinks he established disability. *See* 42 U.S.C. § 423(d)(1)(A). His argument appears to be meritless, and the Court declines to address it any further than hereinabove.

at 23.)

Plaintiff argues that Judge Bush's cited inconsistencies between George's statements and the record medical evidence improperly relied on "one reference to a medical report about using a riding lawn mower due to issues with a push lawn mower, one consultative exam, and two sentences that explain the ability to drive involves using one's extremities and getting into the car." (Pl. Br. at 23.) Further, he argues that Judge Bush "cherry-picked" George's testimony and took his "statements into account in an overly selective manner." (*Id.*) However, his arguments here merely amount to disagreement with how Judge Bush reached her conclusions and the weight she gave to particular evidence. As Plaintiff himself acknowledges in his briefing, this Court's role is to "determine whether substantial evidence exists in the record to support the Commissioner's findings," and it is "not permitted to re-weigh the evidence[.]" (*Id.* at 25 (citing *Chandler*, 667 F.3d at 359 and 42 U.S.C. § 405(g)).) As discussed hereinbelow, Judge Bush's determination with respect to the lack of consistency between George's statements and the record medical evidence was clearly supported by substantial evidence.

Under SSR 16-3p, factors used to evaluate the intensity, persistence, and limiting effects of an individual's symptoms include:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p. Judge Bush's decision not only considered George's daily activities, which included

taking care of children, shopping, and driving, but also his reports of pain. (*See, e.g.*, AR at 23 (referencing George's "constant" back pain).) Therefore, her analysis was not improper as posited by Plaintiff. *See* SSR-16-3p (noting the factors to be discussed in a decision are "the factors pertinent to the evidence of record.").

Further, the contradictions between George's statements and the medical record are made clear in Judge Bush's analysis. As she explained:

> [George] described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. [George] stated that he took care of his three children (cooked/feed, clothe, bathe, helped with homework, and took them to activities), took care of his pets (feed, walked, and interacted with), sometimes prepared his own meals, performed household chores, walked for travel, drove, shopped in stores, spent time with others, got along fine with authority figures, [] which would be inconsistent with his previous statements that he had difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, using his hands, getting along with others, completing tasks, and concentrating. The ability to drive shows the ability to use hand and foot controls, an ability to turn one's head to consult mirrors, to back up, and change lanes, and to sit for continuous period[s] of time. It further demonstrates the ability to bend and stoop to get into and out of a car. In addition, the claimant stated that he was able to mow his yard with a riding lawn mower. It was noted that the claimant returned to work but ceased because the position no longer exist[ed] in August 2022.

(AR at 24 (internal citations omitted).) Judge Bush's findings are "consistent with the Third Circuit's recognition that although any statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them, particularly where such statements are undermined by evidence of a more active lifestyle." *Loneker v. Comm'r of Soc. Sec.*, No. 17-2006, 2018 WL 5784996, at *4 (D.N.J. Nov. 5, 2018) (quoting *Chandler*, 667 F.3d at 363) (internal quotation marks omitted).

To the extent Plaintiff argues Judge Bush did not explicitly cite particular facts that he views as helpful to his case, "[a] written evaluation of every piece of evidence is not required, as long as the ALJ articulates at some minimum level her analysis of a particular line of evidence."

*Phillips v. Barnhart*, 91 F. App'x 775, 780 n.7 (3d Cir. 2004); *Davison v. Comm'r of Soc. Sec.*, No. 18-15840, 2020 WL 3638414, at *8 (D.N.J. July 6, 2020) ("The ALJ cited to multiple other reports and surveyed a significant amount of evidence. He was not required to discuss or describe every page of the record. He did not, as [the claimant] seems to suggest, cherry pick a handful of positive statements out of a universe of negative statements."). Here, Judge Bush was only required to ensure that there was "sufficient development of the record and explanation of findings to permit meaningful review." *Jones*, 364 F.3d at 505. Her determination of a lack of consistency—which relied on voluminous record evidence—was clearly supported by substantial evidence.

### 5.  Medical Opinions of Dr. Levin, Ms. Mount, and Ms. Notaro

Plaintiff next argues that Judge Bush failed to properly consider the persuasiveness of three medical opinions that Judge Bush ultimately found not persuasive. Plaintiff argues that in analyzing the persuasiveness of the opinions of Dr. Rafael Levin, Tracy Mount, PMHNP-BC, and Samantha Notaro, MSW, LCWS, Judge Bush "egregiously failed to articulate the factors used" under 20 C.F.R. § 404.1520c. (Pl. Br. at 26.) These factors include supportability, consistency, relationship with the claimant, specialization, and "other factors that tend to support or contradict a medical opinion or prior administrative medical finding."[6] 20 C.F.R. § 404.1520c(c)(1)–(5). While Plaintiff argues that Judge Bush should have explicitly addressed essentially each and every factor under 20 C.F.R. § 404.1520c(c), the Third Circuit has explained that 20 C.F.R. § 404.1520c(c) "requires administrative judges to explain only two of the[] factors: whether medical opinions were (1) based on 'objective medical evidence and supporting explanations' and (2) consistent with other medical opinions in the record." *Zaborowski v. Comm'r of Soc. Sec.*,

---

[6] The only exception is where "two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same." 20 C.F.R. § 404.1520c(b)(3). In such a case, an ALJ is required to explicitly consider the other factors under 20 C.F.R. § 404.1520c(c). *Id.*

115 F.4th 637, 639 (3d Cir. 2024) (noting these factors are called "supportability and consistency for short").

With Plaintiff's misapprehension of law corrected, the Court first addresses Judge Bush's analysis of Dr. Levin's medical opinion and then addresses Judge Bush's analysis of Ms. Mount and Ms. Notaro's medical opinions.

a.  *Dr. Levin's Medical Opinion*

Dr. Levin opined that George "could lift no greater than 15 pounds, no repetitive bending, and [required] 20 minutes sitting every hour." (AR at 27 (citing AR at 437, 440–442).) With respect to supportability, Judge Bush found that Dr. Levin's opinion "was supported with facts pertaining to [George's] impairments and symptoms cited within the assessment and was given prior to [George's] back surgery." (*Id.* at 28.) However, Judge Bush also determined the opinion was not consistent with the record, given, among other things, that George stated he could lift 20 pounds, and medical documentation indicated he had a normal range of motion and could stand in a forward flexed position without pain. (*Id.* (citing AR at 327–338, 965, 1004–5, 1483, 1503–1505, 1510–1517, 1653, 2162–2168, 2183, 2213, 2215, 2220).)

Plaintiff explicitly acknowledges that Judge Bush considered both supportability and consistency with respect to Dr. Levin's opinion. (*See* Pl. Br. at 26 ("The analysis of Dr. Levin's opinion only considers two factors . . . supportability and consistency.").) This was all that was required of Judge Bush in her analysis. *See Zaborowski*, 115 F.4th at 639. Plaintiff argues that because Judge Bush found the factor of supportability in *favor* of persuasiveness but the factor of consistency *against* persuasiveness, her ultimate finding of "not persuasive" does not follow where the factors come out even for/against persuasiveness. (Pl. Br. 26–27.) However, "the ALJ's decision to give less weight to th[e] opinion[] is consistent with 20 C.F.R. § 404.1520c(c)(2), which explains that the agency may find a particular medical opinion to be less persuasive *when it*

*is less consistent with the evidence from other medical sources and nonmedical sources in the record.*" *Foster v. Kijakazi*, No. 21-827, 2022 WL 4235190, at *2 (D. Del. Sept. 14, 2022) (emphasis added). Judge Bush's decision was supported by substantial evidence where she explicitly considered the factors required by law and determined that an opinion—rendered *before* Plaintiff's spine/back surgery and inconsistent with record medical evidence—was not persuasive. *See Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009) ("[T]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision.").

b.  *Ms. Mount and Ms. Notaro's Medical Opinions*

Judge Bush addressed the medical opinions of Ms. Mount and Ms. Notaro together. She summarized that they opined George "was seriously limited, unable to meet competitive standards, or had no useful ability to function in a number of areas of unskilled work and semi-skilled work and would miss more than four days per month." (AR at 28 (citing AR at 2112–2116, 2233–2239).) She found these opinions to be "not persuasive" after analyzing their supportability and consistency. *First*, she found the opinions, which were "essentially a checkbox form" endorsed "the most significant limits in many areas without citation to objective evidence and without support in treatment notes." (*Id.*) *Second*, Judge Bush determined that the findings were inconsistent with the medical record in establishing a number of Plaintiff's competencies, including with respect to memory and performing daily activities like shopping, taking care of his children, and following written instructions. (*Id.* (citing AR at 327–338, 1503–1505).) Judge Bush also dismissed a narrative statement by Ms. Notaro opining that she believed George met the criteria for disability benefits as "neither valuable nor persuasive." (*Id.* (citing AR at 2233–2239).)

Plaintiff lodges three arguments to counter Judge Bush's determination with respect to these two opinions. *First*, Plaintiff argues that Judge Bush only referenced the factor of consistency

in her decision, "with no mention in any way of any other factor." (Pl. Br. at 27.) This argument is contradicted by the explicit language in Judge Bush's decision, which found the opinions of Ms. Mount and Ms. Notaro to be "without support." (AR at 28.) *Second*, Plaintiff argues that Judge Bush wrongly dismissed the narrative portion of Ms. Notaro's opinion as to George's ability to meet the disability criteria. However, the law is clear that a statement that a claimant is disabled is "inherently neither valuable nor persuasive" as it is the Commissioner—not a medical provider— who is "responsible for making the determination or decision about whether [a claimant] is disabled[.]" 20 C.F.R. § 404.1520b(c)(3). It was not improper for Judge Bush to disregard Ms. Notaro's opinion in this respect.

*Third*, without citing any law in support, Plaintiff argues that by combining her findings regarding two separate medical opinions into one analysis, it is "unclear to subsequent reviewers whether [Judge Bush's] analysis presented pertains to either provider[], or both." (Pl. Br. at 27.) Plaintiff points to the use of the singular "opinion" by Judge Bush throughout her analysis, but this does not render the decision unclear where Judge Bush cited to each opinion separately and explicitly referenced "opinions" plural in her ultimate finding of unpersuasiveness. (AR at 28.) Indeed, the record reveals both opinions used what appears to be the same "Mental Residual Functional Capacity Questionnaire" to issue their opinions. (AR at 2112–2116, 2235–2239.)

However, Judge Bush was not required "to use particular language or adhere to a particular format in conducting h[er] analysis." *Jones*, 364 F.3d at 505. Rather, as previously discussed, she was only required to ensure "sufficient development of the record and explanation of findings to permit meaningful review." *Id.* Judge Bush ensured sufficient development of the record by dismissing Ms. Mount and Ms. Notaro's opinions for the same reasons—neither was supported with citation to record evidence, and neither was consistent with the medical evidence which

indicated Plaintiff could perform a substantial amount of daily activities and memory-related tasks, such as serial sevens. (AR at 28 (citing AR at 327–338, 1503–1505).) Even assuming *arguendo* that Judge Bush should have analyzed the two opinions in separate paragraphs, Plaintiff does not explain how this would change the ultimate outcome in this matter. *See N.V. v. Comm'r of Soc. Sec.*, No. 23-1888, 2024 WL 124628, at *2 (D.N.J. Jan. 11, 2024) ("Plaintiff . . . bears the burden, on appeal, of showing not merely that the Commissioner erred, but also that the error was harmful. At the first four steps, this requires that Plaintiff also show that, but for the error, she might have proven her disability."). Judge Bush's careful and well-reasoned analysis of the persuasiveness of the three medical opinions cited by Plaintiff was clearly supported by substantial evidence in the record.

### 6. Step Five Determination

Finally, Plaintiff argues that the Commissioner failed to meet their burden at Step Five because the representative occupations provided by the VE and relied upon by Judge Bush—namely collator operator, price marker, and mail sorter—"are obsolete." (Pl. Br. at 31.) Plaintiff's argument relies on a tenuous connection to two Emergency Memos issued by the Commissioner, EM-24026 and EM-24047. (Pl. Br. at 30–31.) EM-24026, titled "Isolated Occupations We Will Not Use to Support a 'Not Disabled' Finding at Step Five of the Sequential Evaluation Process," lists a number of "isolated" occupations that "adjudicators may not cite . . . to support a 'not disabled' determination or decision that uses the medical-vocational guidelines." EM-24026, Social Security Administration (June 22, 2024), *available at* https://secure.ssa.gov/apps10/reference.nsf/links/06212024021759PM. "Isolated" occupations are "occupations with jobs that 'exist only in very limited numbers in relatively few locations outside of the region where [the individual lives].'" *Id.* (quoting 20 C.F.R. §§ 404.1566(b) and 416.966(b)). Importantly, *none of the occupations relied upon by Judge Bush are referenced in*

*EM-24026. See id.*

EM-24027 is titled, "Guidance Regarding the Citation of Certain Occupations at Step Five of the Sequential Evaluation Process." *See* EM-24027, Social Security Administration (Jan. 6, 2025), *available at* https://secure.ssa.gov/apps10/reference.nsf/links/01062025092030AM. This Emergency Memo lists a separate set of occupations for which there are "heightened evidentiary and articulation requirements" as multiple courts had questioned "whether some occupations continue[d] to be performed in the manner in which they [were] described in the [DOT]." *Id.* Again, *none of the occupations relied upon by Judge Bush are referenced in EM-24027. See id.*

Regardless of the fact that collator operator, price marker, and mail sorter are not referenced in either Emergency Memo, Plaintiff argues that "the occupations cited in the Decision conflict with underlying Agency Definition and that a resolution of that conflict was required by SSR 00-04p." (Pl. Br. at 31.) More specifically, Plaintiff argues that none of the three occupations "are described in the DOT as they are currently performed in the national economy. In fact, all three occupations were last updated in the DOT in 1977." (*Id.*) Plaintiff cites to SSR 24-3p—which came into effect *after* Judge Bush issued her decision—to argue that Judge Bush (and presumably, the VE) should have relied on another, more up-to-date data source in reaching their conclusions at Step Five. (*Id.*) However, even assuming that Judge Bush was somehow supposed to consider a ruling that had yet to come into effect, SSR 24-3p is clear that the Administration "continue[s] to recognize the DOT as a valid and reliable source of occupational information" and "will continue to use it in adjudication." SSR 24-3p (listing an effective date of January 6, 2025). Further, the Emergency Memos do not create conflicts with the DOT as they are silent with respect to the occupations cited by the VE and Judge Bush in her decision. Plaintiff does not cite the Court to any law suggesting Judge Bush was required to engage in the tenuous extrapolation he suggests in

order to have the occupations cited by Judge Bush fall within the gambit of the Emergency Memos.

Contrary to Plaintiff's assertions, Judge Bush's determinations at Step Five regarding occupations representative of George's RFC were supported by substantial evidence. As the Commissioner—who maintains the burden at Step Five—argues on appeal, "[Judge Bush] relied on vocational expert testimony in finding that Plaintiff could perform the representative jobs of collator operator, price marker, and mail sorter, given an RFC for a limited range of light work with additional postural, environmental, and mental limitations . . . This reliance was reasonable and entirely proper." (Opp. Br. at 30.) Indeed, an ALJ is "entitled to rely on the VE's testimony as substantial evidence at step five of the evaluation" where the ALJ poses accurate hypotheticals reflecting a plaintiff's RFC to the VE. *Seabon v. Comm'r of Soc. Sec.*, No. 10-2268, 2011 WL 3425508, at *9 (D.N.J. Aug. 4, 2011). In response to hypotheticals which reflected George's RFC, the VE testified that there were collator jobs, price marker jobs, and mail sorter jobs in the national economy that George could perform. (*See* AR at 66–68 (citing to the DOT in each instance).) In determining the number of these jobs available, the VE "reduced the job numbers" for price marker and mail sorter by between 50 and 75 percent to reflect George's limitations. (*Id.*) Even accounting for those reductions, the VE testified there were 174,000 jobs that existed nationally that George could undertake consistent with his RFC. (*Id.*) Judge Bush's determination that there was "other work that exist[ed] in significant numbers in the national economy" which George could perform was supported by substantial evidence.[7] (*Id.* at 30); *Scott R.*, 643 F. Supp. 3d at 498 ("A vocational

---

[7] Plaintiff also puts forth barebone arguments that (i) the record "does not contain information regarding whether [the cited occupations] are performed with more modern tools or processes," (ii) Judge Bush's decision "does not contain an evaluation of the apparent conflict" between the cited occupations and the "underlying Agency Definition," and (iii) "it is unclear if the remaining occupation cited exists in significant numbers." (Pl. Br. at 31, 32.) None of these arguments have any merit. *First*, neither the Emergency Memos nor SSR 24-3p (which, again, came into effect after Judge Bush's decision) imposed a requirement on Judge Bush to consider whether the cited occupations were "performed with more modern tools or processes." *Second*, the Emergency Memos contain explicit lists of the occupations covered within each Memo, and Judge Bush's cited occupations appear in neither. Plaintiff cannot conjure up a conflict that does not exist. *Third*, Plaintiff does not explain what he means by it being "unclear" that a particular

expert may rely on the DOT, and the ALJ may rely on the vocational expert's testimony to the extent it is consistent with the DOT[.]" (cleaned up)).

In sum, Judge Bush undertook a comprehensive and well-thought out 14-paged factual recitation and analysis that involved a "careful consideration of the entire record," including subjective complaints, medical evidence, medical opinions, prior administrative findings, a third-party statement and the VE's testimony. (*See* AR at 17–30.) The Court finds that each determination, including Judge Bush's ultimate finding of non-disability, was clearly supported by substantial evidence. Accordingly, the Commissioner's decision is **AFFIRMED**.

---

cited occupation "exists in significant numbers." (*Id.*) The VE testified that each of the three cited occupations existed in significant numbers in the national economy, and "[i]t is not for this Court to reform the methodology that SSA [vocational experts] use to determine available and appropriate jobs in the national economy that match a claimant's RFC." *Scott R.*, 643 F. Supp. 3d at 497 (quoting *Jean-Pierre v. Comm'r of Soc. Sec.*, No. 16-05691, 2017 WL 4316880, at *9 (D.N.J. Sept. 28, 2017)).

## CONCLUSION

Having reviewed the record as a whole, the Commissioner's decision is **AFFIRMED**. An appropriate Order follows.

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: July 8, 2025

29